[Civ. No. 14170. First Dist., Div. One. May 17, 1950.]

GERHARD SCHMIDT, Appellant, v. J. W. CALLERO et al., Respondents.

EDWIN D. CHIOSSO et al., Respondents, v. GERHARD SCHMIDT, Appellant.

Lorne M. Stanley and Douglas A. Pease for Appellant.

Albert Picard and Alfred E. Graziani for Respondents.

PETERS, P. J.—Gerhard Schmidt contracted with J. W. Callero and the Chiossos for the purchase of a resort in Shasta County known as Clark Creek Lodge. The contract was entered into on March 23, 1946, and shortly thereafter Schmidt took possession. The purchase price was not paid in full, and on November 21, 1946, Schmidt served notice that he was rescinding the agreement. In May, 1947, he brought an action for declaratory relief, seeking in particular a declaration that the contract of sale had been rescinded. The Chiossos and Callero countered with an action for specific performance, and the cases were consolidated for trial. Separate judgments were rendered in each action, both being adverse to Schmidt. The court determined that no valid notice of rescission had been given; that Schmidt had no grounds for rescission; that Schmidt should pay the balance of the purchase price; and ordered the money already in the possession of the escrow holder to be paid over to the Chiossos and Callero. From these judgments, Schmidt appeals.

The Clark Creek Lodge property, consisting of over 220 acres of land, buildings and various items of personal property, was operated as a hunting and fishing resort by Callero and the Chiossos. The sale of the property to Schmidt was negotiated through Zachary, a real estate broker. Callero and Schmidt discussed the terms of the sale in Zachary's office in March, 1946. At that time, Callero told Schmidt that he wanted to exclude from the sale a building known as the Roberts Cabin, which he desired for his personal use. Callero also stated that he wanted some additional land around the cabin on which he could build a garage and a chicken house, and that, for these purposes, he wished to reserve about an acre of land for himself. Schmidt agreed to this reservation, and told Callero that because Callero had lived in the region for so many years and knew so many people, his presence on the property would be beneficial to the Lodge's business.

Schmidt gave Zachary $5,000, to apply on the purchase price, and a contract was drawn by Zachary and signed by the parties. It provided that Schmidt was to receive "Clark Creek Lodge, approximately 220 acres, all buildings, except cabin known as Roberts Cabin" and certain enumerated items

of personal property. The balance of the $40,000 purchase price and the bill of sale were to be placed in escrow upon the following conditions:

"1. Buyer is given title (clear) to property.

"2. $20,000.00 is placed in escrow within ten days.

"3. $15,000.00 is placed in escrow upon the sale of purchaser's home in San Francisco.

"4. Purchase price be released to Sellers upon completion of title search. That in case home of purchaser has not been sold upon completion of title search the said $5,000.00 and the said $20,000.00 shall be released to the Sellers and Buyer will give a promissory note for $15,000.00 secured by the above property."

On March 27, 1946, Zachary, the Chiossos, Callero and his wife, and Schmidt met in the Redding office of Cummock, a licensed accountant, and the parties agreed to have Cummock serve as escrow holder. No written instructions were ever given to Cummock by any of the parties at this meeting. Callero again mentioned his desire to retain some land around the Roberts Cabin, and Schmidt again stated that this was agreeable to him. Schmidt gave Zachary a check for $20,000, which Zachary turned over to Cummock, and that same day Schmidt took possession of the property. He has remained in possession until this time.

Shortly after April 1, Callero began to remodel Roberts Cabin. He was advised that extensive remodeling was impractical in view of the fact that the cabin had wooden foundations, so he tore down the cabin and on its site built a house with concrete foundations. The new house consisted of four rooms and a porch, and was completed in September or October of 1946 at a total cost of around $17,000. The building of this house was a great source of worry to Schmidt, who feared that Callero intended to use it as a resort in competition with the Clark Creek Lodge. This fear appears to have been groundless.

In April, 1946, Cummock requested the Shasta County Title Company to make a preliminary title search. He was advised that the title was not clear. The nature of the cloud on the title is described in a letter written on October 3, 1946, by Buchtel, vendors' attorney, to Stanley, Schmidt's attorney:

"As you know, the contract drawn by the San Francisco real estate agent calls for the sale of Clark Creek Lodge containing approximately 220 acres, with a reservation of a small parcel to Callero across Clark Creek from the Lodge. Our

first problem was to have the reservation surveyed, as the description which was originally put of record some years ago did not close. This has been done, and the proper deeds and map are now recorded for that matter.

"After Chiosso and Callero acquired Clark Creek Lodge they purchased four tax titles. This matter, at first, seems comparatively simple to clear up; however, the descriptions of the tax titles are such that three of them can probably not be located on the ground. One of them, in fact, does not close, but just is a series of lines.

· "The history of this property easily accounts for this in that at one time the Clark Creek area was started as a subdivision for a construction camp, and many of the original descriptions were done by people who were not surveyors. However, the perimeter description can be located on the ground and does close. In fact, there are approximately 240 acres in the Clark Creek Lodge area, and the tax title acreage amounts to less than three acres as far as we can figure. Mr. Chiosso and Mr. Callero stand ready at any time to convey the area containing approximately 237 acres and can at any time give a policy of title insurance on that area. However, it has been my interpretation that when they agreed to sell Clark Creek Lodge, it should include the tax titles.

"Unfortunately the last of these tax titles was not purchased until May of 1942 and unfortunately our Title Company will not issue a policy without the reservation of reopening of the judgment as to the tax titles for one year after the date of judgment unless the prospective period has run before the filing of the suit. Furthermore, our Title Company is very fussy about showing the nonmilitary service of defendants that cannot be found.

"I am enclosing a copy of the Complaint. You will notice that I have used the perimeter description of the Clark Creek Lodge with certain defined exceptions that are not a part of the Clark Creek Lodge property and which can be located on the ground, and that I have set out in Paragraph II that the defendants may claim an interest in and to the parcels therein set out, which parcels are a part of the Clark Creek Lodge property, and are the tax titles in question.

"Personally, I would like to suggest, as it was my intention to suggest to Mr. Schmidt when we called upon him, that Chiosso and Callero should now convey the 237 acres which, of course, is 17 acres more than he expected to get, and that

next May we bring a quiet title suit for the three or less acres involved.

"At the time of conveyance of the 237 acres we will be willing to give a policy of title insurance and, after the quiet title suit on the tax titles is completed, we will give a continuation policy on the entire Clark Creek area.

"If this suggestion is not satisfactory we will continue with the quiet title suit and will deliver the policy as soon as possible."

Prior to the writing of this letter, Cummock and Buchtel had called on Schmidt to tell him that a quiet title suit would probably be necessary. This call was made on August 10th, and Schmidt's only comment was that he had to have a clear title. No request was made by Schmidt for immediate conveyance of a deed, no objection was made to the bringing of a quiet title action, and no objection to the delay caused by the tax title problem was raised by Schmidt.

On August 29, 1946, Schmidt wrote to Zachary, giving the latter a 45-day exclusive authorization to sell the property. The letter stated: "I can tell you one thing Bill, whoever buys the place doesn't make a mistake. If you see our Register and use your own honest judgment you can see what the place can produce. As far as I'm concerned I would never sell the property but as you know already, Mrs. Schmidt doesn't like the country and we may as well move out. The class of customers we get out here are A 1 and money doesn't mean anything, good times or bad ones." Zachary was authorized to sell the property for $50,000 cash. Thus, it is clear that Schmidt, as late as August 29, 1946, was perfectly satisfied with his contract with Callero and the Chiossos, had no objections to the delay caused by the quiet title action, thought the property was his, but wanted to sell, at a profit, because of the objections of his wife. This explains his later actions.

On September 9, 1946, the vendors deposited in escrow a deed to the entire 240 acres.

On September 11, 1946, Stanley wrote Cummock informing him that he was Schmidt's attorney, stating that he had heard of the quiet title suit and asking for details of it. On September 26, Stanley wrote Cummock stating that he had been advised by the Shasta County Title Insurance Company that there had been a failure of title which had not been cleared. On September 27, Stanley wrote Buchtel asking for a copy of the preliminary report of the title search and for a copy

of the pleadings in the quiet title action. "Also, please let me know your estimate of when you think title to this property can be cleared."

Following these communications, a lengthy correspondence between the two attorneys ensued. In this correspondence, Stanley asked that the Shasta County Title Insurance Company be substituted as escrow holder, requested information concerning the size of the Roberts Cabin tract, and the "unusual building" that was being built on the tract. Buchtel refused to change the escrow holder, gave his assurance that Callero was not going into competition with Clark Creek Lodge, and offered to furnish Stanley with a copy of the survey of the Roberts Cabin tract if Schmidt would pay the $15 charge for such a copy. On October 8, Buchtel wrote to Stanley: "The situation is very simple in that Mr. Schmidt, if he could be reasoned with, is getting 240 acres instead of 220. We still stand ready to convey to him 237, which is more than he bargained for." On October 30, Buchtel wrote Stanley that the Roberts Cabin tract consisted of "a little over one-half an acre. . . . I wish you would ascertain if Mr. Schmidt would take a conveyance with a policy of title insurance on the 237 acres of the property involved. We, of course, would put up a bond on delivery of the good title to the three acres, and the expense would be borne by the sellers on the title insurance."

On November 21, 1946, Schmidt served the vendors with a notice of rescission. He attempted to rescind the contract "on the ground that the agreement of the undersigned to purchase the same was given because of the fraud practiced on the undersigned by you, to-wit: On your representation that you were operating said going concern with full compliance under the law; that you would deliver title forthwith; that the Shasta County Title Company would act as escrow holder; that the so-called Roberts Cabin was to be used only as a seasonal hunting or fishing cottage with a specified limited ground space; and on the further ground that through your fault the consideration for said agreement has failed; and on the further ground that such consideration has failed in a material respect; and on the further ground that such consideration is void." Schmidt offered to restore everything of value which he had received upon payment to him by the vendors of the $25,000 he had paid on the purchase price plus the sum of $6,000 to reimburse him for the expenditures he had made on the Lodge since taking possession.

On December 10, 1946, Buchtel wrote Stanley refusing to accept the rescission, and reiterated his offer to deliver a deed and title insurance policy to the 237 acres at once. He stated that the vendors ''intend to continue to press the quiet title suit on the three unidentified floating acres to a conclusion as rapidly as is legally possible. I realize that you understand that the three acres involved were not within the area known as the Clark Creek Lodge when that Lodge was purchased by Messrs. Callero and Chiosso.''

On December 23, 1946, Stanley wrote Buchtel asking for a conference to see if the difficulties between the parties could not be resolved. The conference did not take place.

On March 27, 1947, judgment was given and entered for the vendors in their quiet title action. Buchtel notified Stanley of the entry of this judgment on the same day, and stated ''We now stand ready to convey the Clark Creek Lodge property to Mr. Schmidt under the contract.''

The following day, Stanley replied: ''I am still waiting for a letter of the title company report, a copy of the survey, a copy of the proposed deed, a copy of the survey showing the three parcels of land agreed to be delivered, a plat of the property to be delivered containing a specification of the number of acres, also the specific survey of the Roberts cabin piece. In other words, I have not received as yet anything that will show me what your clients propose to deliver.''

On March 31, 1947, Buchtel replied that ''If I were willing to authorize my clients to spend useless money on an additional report from the Title Company, you would find that title is vested in the Chiossos and Callero with the four exceptions therein listed. If you were to check your file you would see by my letter of March 27 that the fourth exception is the 'so-called Roberts Cabin tract.' ''

On April 1, 1947, Cummock wrote the Schmidts that ''I am now prepared to deliver to you a proper Grant Deed and clear title to Clark Creek Lodge property, consisting of approximately 240 acres.

''As escrow holder, demand is therefore made upon you for the sum of $15,000.00 as the balance due set out in said Contract.

''Upon such payment I will deliver the Deed to you and request the issuance of the Policy of Title Insurance.''

More correspondence between the attorneys followed, and on April 7, 1947, Stanley wrote to Buchtel a long letter reviewing the transaction, and asking again for a copy of the

survey made on the property, a map showing what the property looked like, and a title company certificate of title.

No answer to this letter is revealed by the record. The present litigation followed.

■ The vendors are entitled to judgment in their action for specific performance only if they have performed all the terms of the contract. The fundamental question in this case is whether they substantially complied with that portion of the contract which required them to complete a title search of the property, which all parties interpret as including the necessity of tendering a title policy. Cummock testified that the title insurance company had been asked for a preliminary report on the title, but despite the frequent offers of Buchtel to supply Schmidt with a deed and title policy to 237 acres, it is clear that no title policy was ever obtained by him and no complete search was ever made. As late as April 3, 1947, when Cummock made formal demand on Schmidt for the balance of the purchase price, no title policy had yet been obtained by the vendors, and no title search had been completed. Under these conditions, Schmidt was not required by the terms of the contract to pay the balance of the purchase price. The trial court's finding that the vendors had completed their part of the transaction was based on a misunderstanding of Plaintiffs' Exhibit 1. The following portion of the transcript reveals the error:

"The Court: Now, Mr. Picard, the preliminary report of the title insurance company has not been received in evidence. You remember it was received for identification. Do you feel that you are now in a position to offer it in evidence?

"Mr. Picard: Yes, I think all the deeds have been offered, if your Honor please. I think I should have offered it, I will offer it now as Exhibit 1 in evidence."

What was received in evidence as Exhibit 1 was a title insurance policy issued to the vendors in 1942 when they purchased Clark Creek Lodge. It was not a preliminary report of the title company, in connection with the transaction now before the court, nor was any such report ever submitted in evidence.

By the terms of his contract, Schmidt was entitled to a completed title search as well as clear title, before he could be placed in default. Such a search has never been delivered to him, under the fourth condition stated in the contract, that the "purchase price be released to Sellers upon completion of title search." Until this condition has been fulfilled by

the sellers, they are not entitled to receive the purchase price. Finding VIII of the trial court, in the specific performance action, finds that "the plaintiffs have fully performed all of the terms and conditions of said contract on their part to be performed, and have always been and now are ready, willing and able to fully carry out and perform all of the terms and conditions of said contract required therein to be performed by them . . ." This portion of the finding is not supported by the evidence. Equity will not compel the buyer to perform his contract when it cannot guarantee performance by the vendor. We cannot say, in the absence of evidence, that a completed title search will reveal clear title in the vendors, nor can we assure the buyer that a title insurance policy will be issued. It would therefore be inequitable to order the buyer to pay unconditionally to the vendors the balance of the purchase price, and unconditional specific performance cannot be granted. This does not require a complete reversal, however, but may be handled by a modification of the findings, conclusions and judgments as hereinafter set forth.

In his action for declaratory relief, Schmidt has asked that the court declare the rights, duties and obligations of the parties under the contract, and has also asked that the court find that the agreement between the parties has been rescinded. He asks that the court return to him the $25,000 he has paid on the contract, $6,000 to reimburse him for expenditures which he has made on the property, and interest.

None of the grounds set forth in the notice of rescission is supported by the evidence. First, Schmidt claimed that it was represented to him that the Lodge was being operated by the vendors "with full compliance under the law." There is substantial evidence that no such representation was made to him. Furthermore, there is no evidence indicating that the resort was not being operated lawfully by the vendors at the time of sale. Second, Schmidt attempted to rescind on the ground that the vendors "would deliver title forthwith." The vendors were entitled to a reasonable time to deliver title, as neither the contract nor any parol agreement specified a definite time. It must be remembered that the contract was executed on March 23, 1946, and from that date until August 10, 1946, conveyance of title was not even discussed by the parties. On August 10, Schmidt was informed by the vendors that a quiet title action would be necessary. Schmidt made no objection, and stated only that he wanted a clear title. Schmidt's attorney, who knew in

September that the vendors were bringing a quiet title action, made no objection. He inquired only as to the status of the action, and asked for a copy of the pleadings. Buchtel, in his letter of October 3, 1946, replied that he was ready to convey immediate title with a title insurance policy to 237 acres. He wrote that *the following May* he would bring a quiet title suit for the three acres acquired at tax sales, and "after the quiet title suit on the tax titles is completed, we will give a continuation policy on the entire Clark Creek area.

"If this suggestion is not satisfactory we will continue with the quiet title suit and will deliver the policy as soon as possible." In the communications which followed, neither Schmidt nor his attorney made any objection to the bringing of this action nor to the delay which would be involved. At no time did Schmidt demand an immediate conveyance of title. Any rights which he might have had to an immediate conveyance were thus waived. Thirdly, Schmidt claimed that it was represented to him that the Shasta County Title Company would act as escrow holder. The testimony of all parties other than Schmidt was that all of the parties, including Schmidt, had agreed to allow Cummock to serve as escrow holder. Fourthly, Schmidt attempted to rescind on the ground "that the so-called Roberts Cabin was to be used only as a seasonal hunting or fishing cottage with a specified limited ground space." There was no evidence that the cabin, with a limited ground space, was ever used or intended by Callero to be used for anything other than his own personal use. Schmidt's fear that the cabin was to be used as a resort in competition with the Lodge appears to have been groundless. The other grounds given for the rescission were general allegations of failure of consideration, which were without merit.

In the correspondence which preceded and followed the notice of rescission, Stanley complained that he had never received a copy of the escrow instructions, that he had not received a survey of the area involved in the sale, and that he had not received a copy of a survey made of the Roberts Cabin tract. The answers to these complaints are: First, there were no written escrow instructions, and therefore no copy could be supplied him; second, he was not entitled by the terms of the contract to a copy of the survey, and the vendors could not be subjected to this expense; third, Buchtel informed

him that if he would pay $15 for the cost of a copy of the survey of the Roberts Cabin tract, he would furnish him with a copy.

It is thus apparent that, even if Schmidt had justifiable grounds for rescission inasmuch as he was not tendered a completed title search and policy, he waived this ground by failing to object when he was told that a quiet title action was necessary before the title policy could be delivered to him. The trial court's finding that the rescission was invalid because it was not made promptly, which is supported by the evidence, also prevents Schmidt from successfully basing his rescission on this ground.

As the situation now stands, the following are the basic facts: The vendors apparently have clear title, but have failed to complete a title search. In all other respects they have complied with the terms of the contract. It further appears, according to their testimony, that the only obstacle to receiving a title insurance policy (i. e., the decree quieting title to the three acres obtained at tax sale) has been hurdled, and they will now be able to deliver a title insurance policy to the entire 240 acres. Since March, 1946, they have not only been without their property but have also received only $5,000 of the $40,000 purchase price. ($20,000 of the amount paid by Schmidt remains in escrow.) On the other hand, Schmidt has been in possession of the property since March, 1946, and has been operating the lodge as a resort since that time. For this property, he has paid only $25,000 of the $40,000 price.

Both parties have come in to equity to ask that relief be granted and that justice be done. By prohibiting Callero, his heirs and assigns from using the Roberts Cabin tract as a commeracial enterprise, and from using it in competition with Clark Creek Lodge, Schmidt is completely protected against his greatest fear. The trial court has made this a part of its decree. The trial court has also limited the size of the Roberts Cabin reservation to less than a quarter of an acre. While it is true that there is no evidence to support the precise description of the quarter of an acre reserved in the decree, this reservation is less than one-third of the land which the evidence shows Schmidt agreed should be excepted from the sale. Schmidt is benefited rather than injured by the reservation of the smaller parcel. The sellers cannot complain as they have not appealed.

Schmidt does not contend that title to the property contracted for is not clear, nor is there any evidence to indicate

a cloud on the vendor's title. The record reveals that of the 240 acres which Buchtel thought should be conveyed under the contract (which called for delivery of only 220 acres), title insurance could not be obtained without a quiet title decree on three acres purchased at tax sales. Had these acres not been included in the deed offered by the vendors, and had the vendors included only the remaining 237 acres in their deed and offer of title policy, it would appear that they would have been entitled to performance of the contract by Schmidt. Out of an overabundance of caution, and what appears to be extraordinary conscientiousness on the part of the vendors' attorney, the vendors delayed making a conveyance until the entire 240 acres could be conveyed with a title insurance policy. Such delay was countenanced and acquiesced in by Schmidt, who was offered but refused to accept in October, 1946, a deed and title policy to 237 acres. It would be grossly inequitable, under these circumstances, to permit Schmidt to rescind solely because of the failure of the vendors to present a title search and policy.

The only thing for which Schmidt has bargained and which he has not received, is a title insurance policy and deed to the Clark Creek Lodge property. If the vendors are able to deliver such a policy and deed to him, they are entitled to a decree of specific performance. Of course, if the vendors are unable to deliver such a policy and deed to Schmidt, he is entitled to the remedies provided by law.

One further point should be mentioned. The judgment of the trial court awarded the vendors the balance of the purchase price with interest from May 10, 1946. How this date was selected by the court is not explained by the evidence nor by the respondents. In any event, as the vendee has not yet been placed in default, the vendors are not entitled to interest on the balance of the purchase price. Upon delivery to the escrow holder of a title insurance policy, they are entitled only to the amount called for by the terms of the contract.

This is an equitable proceeding. Justice will best be served, and equity done to all parties, by a modification rather than a reversal. It is therefore ordered that the trial court shall modify the findings, conclusions and judgments by striking therefrom the provisions awarding the vendors interest on the balance of the purchase price from May 10, 1946, and by making Schmidt's liability for the balance of the purchase

price conditional upon the delivery to him, within 60 days of the date this decision becomes final, of a title search and insurance policy showing clear title in the sellers to the entire 240 acres. If such search and policy are not tendered within the time limited, Schmidt is relieved of all liability for the balance of the purchase price and is entitled to a declaration then to be made by the trial court, for which purpose jurisdiction is retained, that all sums paid by him to the sellers, plus expenditures for improvements, less net profits, if any, are to be refunded to him. As so modified the judgments are affirmed, each side to bear its own costs on this appeal.

Bray, J., and Schottky, J. pro tem., concurred.